# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JAMES ROBERTSON,
on behalf of Renee Robertson,

                 **Plaintiff,**

      **v.**                                            **Case No. 19-CV-281**

ANDREW M. SAUL,

                 **Defendant.**

## DECISION AND ORDER

### PROCEDURAL HISTORY

Plaintiff Renee Robertson passed away while this lawsuit was pending; her husband, James Robertson, continues to pursue this action on her behalf. Robertson alleged that she became disabled on September 15, 2014, due to a back injury. (Tr. 209, 229.) In July 2016 she applied for disability insurance benefits. (Tr. 209-15.) After her application was denied initially (Tr. 56-65) and upon reconsideration (Tr. 66-77), a hearing was held before an administrative law judge (ALJ) on April 19, 2018 (Tr. 29-55). On May 29, 2018, the ALJ issued a written decision, concluding that Robertson was not disabled. (Tr. 12-28.) The Appeals Council denied Robertson's request for review on

February 6, 2019. (Tr. 1-5.) This action followed. All parties have consented to the full jurisdiction of a magistrate judge (ECF Nos. 19, 20), and the matter is now ready for resolution.

**ALJ'S DECISION**

In determining whether a person is disabled an ALJ applies a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ determines whether the claimant has engaged in substantial gainful activity. 20 C.F.R. § 404.1571-1576. The ALJ found that Robertson "has not engaged in substantial gainful activity since September 15, 2014, the alleged onset date." (Tr. 17.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment (MDI) or combination of impairments that is "severe." 20 C.F.R. § 404.1520(c). "In order for an impairment to be considered severe at this step of the process, the impairment must significantly limit an individual's ability to perform basic work activities." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). The ALJ concluded that Robertson "has the following severe impairment: degenerative disc disease." (Tr. 18.)

At step three the ALJ determines whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 4, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526) (called "The Listings"). If the impairment or impairments meets or

medically equals the criteria of a listing, and meets the twelve-month duration requirement, 20 C.F.R. § 404.1509, the claimant is disabled. If the claimant's impairment or impairments is not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. The ALJ found that Robertson "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." (Tr. 19.)

Between steps three and four the ALJ must determine the claimant's residual functional capacity (RFC), "which is [the claimant's] 'ability to do physical and mental work activities on a regular basis despite limitations from her impairments.'" *Ghiselli v. Colvin*, 837 F.3d 771, 774 (7th Cir. 2016) (quoting *Moore*, 743 F.3d at 1121). In making the RFC finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. § 404.1529; SSR 96-8p. In other words, the RFC determination is a function-by-function assessment of the claimant's "maximum work capability." *Elder v. Astrue*, 529 F.3d 408, 412 (7th Cir. 2008). The ALJ concluded that Robertson has the RFC

> to perform light exertional work . . . with the following limitations: she requires a sit/stand option, allowing her to shift from either sitting or standing at intervals of approximately every 30 minutes, provided she does not leave the workstation and such position changes result in no more than 5 minutes off-task per hour; she is incapable of climbing ladders, ropes, and scaffolds but is otherwise capable of occasional postural activities; she is capable of frequent rotation, flexion, and/or extension of the neck in all directions; she is capable of frequently reaching in all directions with the bilateral upper extremities; she must avoid all exposure to hazards,

including unprotected heights and moving mechanical parts; and she would be off task up to 10% of the workday due to her impairments.

(Tr. 19.)

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. § 404.1565. The ALJ concluded that Robertson was "unable to perform any past relevant work." (Tr. 22.)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant can do any other work, considering her age, education, work experience, and RFC. At this step, the ALJ concluded that, "[c]onsidering [Robertson's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Robertson] can perform." (Tr. 23.) In reaching that conclusion, the ALJ relied on testimony from a vocational expert (VE) who testified that a hypothetical individual of Robertson's age, education, work experience, and RFC could perform the requirements of a small parts assembler, a laundry folder, and an electronics worker. (Tr. 24.)

After finding that Robertson could perform work in the national economy, the ALJ concluded that Robertson "has not been under a disability . . . from September 15, 2014, through the date of this decision." (Tr. 24.)

## STANDARD OF REVIEW

The court's role in reviewing an ALJ's decision is limited. It does not look at the evidence anew and make an independent determination as to whether the claimant is disabled. Rather, the court must affirm the ALJ's decision if it is supported by substantial evidence. *Moore*, 743 F.3d at 1120. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1120-21 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Thus, it is possible that opposing conclusions both can be supported by substantial evidence. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).

It is not the Court's role to reweigh evidence or substitute its judgment for that of the ALJ. *Moore*, 743 F.3d at 1121. Rather, the court must determine whether the ALJ complied with his obligation to build an "accurate and logical bridge" between the evidence and his conclusion that is sufficient to enable a court to review the administrative findings. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014); *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). "This deference is lessened, however, where the ALJ's findings rest on an error of fact or logic." *Thomas*, 745 F.3d at 806. If the ALJ committed a material error of law, the court cannot affirm the ALJ's decision regardless of whether it is supported by substantial evidence. *Beardsley*, 758 F.3d at 837; *Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012).

**ANALYSIS**

Robertson contends that the ALJ erred in evaluating (1) the intensity, persistence, and limiting effects of her alleged symptoms; (2) the opinions of her treating pain management provider; and (3) the severity of her fibromyalgia impairment. She further contends that the matter should be remanded for consideration of new evidence regarding her cervical impairment and headaches.

## I.     Symptom evaluation

An ALJ must engage in a two-step process to evaluate a claimant's symptoms. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." SSR 16-3p; *see also* 20 C.F.R. §§ 404.1529, 416.929. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." SSR 16-3p. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p.

The ALJ determined that Robertson's "medically determinable impairments [could] reasonably be expected to cause [her] alleged symptoms; however, [Robertson's] statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record" (Tr. 22). The ALJ explained that Robertson's treatment records did not support her alleged disabling symptoms, as her impairments were "generally mild to moderate in nature," and "[p]roviders offered conservative treatment for these impairments, which generally appears to control her symptoms." (Tr. 21.) Likewise, according to the ALJ, "there [were] no consistent indications from any of [Robertson's] providers that they felt that [she] [had] serious ongoing functional deficits." (Tr. 21.) The ALJ also found that Robertson's "testimony was inconsistent with her own function report, where she detail[ed] far greater capabilities than stated at the hearing." (Tr. 22.)

Robertson argues that the ALJ mischaracterized the record when evaluating her alleged symptoms. (ECF No. 13 at 12-17; ECF No. 18 at 3-4.) She maintains that the ALJ "cherry-picked" evidence to show improvement in symptoms and erroneously equated improvement with an absence of functional deficits. She also contends that her hearing testimony was largely consistent with her function report. These errors are material, according to Robertson, as the VE testified that no work would be available for someone with Robertson's alleged symptoms and limitations. (ECF No. 13 at 17-18.)

The court agrees that the record does not support the ALJ's conclusion that Robertson's alleged symptoms were generally controlled with treatment. The ALJ fairly characterized Robertson's treatment—which consisted of physical therapy, medication management, and epidural steroid injections—as "conservative." (*See* Tr. 322-23, 330-31, 334.) However, the ALJ ignored evidence that was inconsistent with the effectiveness of this course of treatment. *See Moore*, 743 F.3d at 1123 (citations omitted) ("[A]lthough an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it.").

For example, the ALJ stated that physical therapy relieved Robertson's symptoms. (Tr. 20 (citing Exhibit 3F).) However, the record shows that the results of physical therapy were mixed at best. Robertson reported that physical therapy helped decrease her soreness and stiffness, but her symptoms quickly returned when she was discharged. (Tr. 322, 328, 330, 333.)

Similarly, while Robertson sometimes reported improvement with medication (Tr. 324, 326, 328, 466, 468, 484, 487, 508, 533, 537, 541, 549, 566), she also claimed that her pain continued to interfere with her daily activities despite medication (Tr. 468, 481, 484, 487, 533, 537, 545, 549, 552, 574). The ALJ failed to mention that Robertson's medications caused significant drowsiness, resulting in her sleeping ten to twelve hours a day. (Tr. 41, 508.)

The ALJ also erroneously asserted that Robertson "received improvement from periodic epidural steroid injections." (Tr. 20 (citing Exhibit 1F, 2F).) Robertson consistently stated that the injections resulted in minimal or no relief. (Tr. 42, 333, 466, 468, 509, 537, 554.) Moreover, while the ALJ stated that Robertson underwent a medial branch block in October 2016 (Tr. 20 (citing Exhibit 9F/7)), he failed to acknowledge that this procedure made her pain worse (Tr. 552). The ALJ also noted that certain providers did not believe surgery was warranted (Tr. 20 (citing Exhibit 4F/3, 4F/5)), but he did not mention that other providers had discussed surgery with Robertson (Tr. 322-23, 330, 334).

Accordingly, the record shows that Robertson's conservative care did not resolve her symptoms, as she continued to have pain that affected her daily activities. The ALJ failed to confront this evidence and explain why it was rejected. His inference concerning the effectiveness of treatment is not logically based on record evidence. *See Brown v. Barnhart*, 298 F. Supp. 2d 773, 793 (E.D. Wis. 2004) (citation omitted) (noting that "the court need not defer to a credibility determination based on a misunderstanding or one-sided view of the evidence").

The court also agrees that the record does not support the ALJ's finding of an inconsistency between Robertson's hearing testimony and her function report.[1] At the administrative hearing in April 2018 Robertson testified that her pain was so bad that she couldn't work and she didn't do much of anything during the day. (Tr. 36.) She stated

---

[1] The Commissioner did not respond to this argument. (*See* ECF No. 17 at 10-11.)

that she spent most of the day lying down, she needed reminders to take her medications and for appointments, she rarely vacuumed because it took too long, and she had difficulty doing laundry. (Tr. 40-43.) Robertson also claimed that her husband took care of most of the cooking, cleaning, and grocery shopping. (Tr. 42-43.)

In her August 2016 function report, Robertson reported that she spent much of the day sleeping or resting, she tried to make dinner but could prepare only "very simple meals mainly 1 course," and she kept notes and alarms to remind her to take her medications. (Tr. 257-60.) Robertson indicated that she performed light cleaning and laundry each day, but it took her two to three hours, and she needed help completing a more thorough cleaning. (Tr. 260.) Robertson further indicated that her husband helped with cleaning the house, grocery shopping, cooking dinner, doing yardwork, shopping, and shoveling snow. (Tr. 258.) Thus, the record shows that Robertson did not "detail[] far greater capabilities" in her function report "than stated at the hearing."

Moreover, when confronted about the alleged inconsistency between her hearing testimony and function report, Robertson told the ALJ that her husband had completed the report for her. (Tr. 45-47.) The ALJ responded that, because Robertson's name was on the report, he had to assume she filled it out unless she could prove otherwise. (Tr. 46.) Ten days after the hearing, Robertson's husband submitted an affidavit claiming that he completed the function report and that he may have answered some questions without his wife's input. (Tr. 301) Nevertheless, the ALJ's decision did not address the affidavit,

and there is no evidence he considered possible explanations for the minor discrepancies between Robertson's hearing testimony and function report.

Overall, the ALJ's evaluation of Robertson's symptoms lacks explanation and support in the record. *See Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (citing *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)) (holding that "an ALJ's decision to discredit a claimant's alleged symptoms" may be overturned "only if the decision is 'patently wrong' meaning it lacks explanation or support"). Because the VE testified that no employer would tolerate an employee with Robertson's claimed limitations—that is, a need to lie down throughout the workday and take unscheduled breaks (Tr. 52-53)—the ALJ's decision must be reversed.

## II. Opinion evidence

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine how much weight to give the opinion. *Moss v. Astrue*,

555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)). "An ALJ must offer good reasons for discounting a treating physician's opinion." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations and citation omitted).

Robertson began treating with Dermot J. More-O'Ferrall, MD, a pain management specialist, in February 2016. (Tr. 481-83.) On October 4, 2016, Dr. More-O'Ferrall completed a "Lumbosacral Spine Impairment Medical Assessment Form" detailing Robertson's functional capabilities. (Tr. 501-04.) He opined that Robertson would be off task 25 percent of the workday and work at 70 percent the pace of an average worker; could sit for thirty minutes at a time and at least six hours in a workday; could stand for thirty minutes at a time; could stand/walk for about two hours in a workday; could frequently lift less than ten pounds, occasionally lift ten pounds, and rarely lift twenty pounds; and could only occasionally twist and stoop. Dr. More-O'Ferrall further opined that Robertson would need four unscheduled breaks each workday and would likely be absent from work three days per month due to treatment or "bad days" with symptoms.

The ALJ assigned little weight to Dr. More-O'Ferrall's opinions, finding them "inconsistent with the evidence as a whole and not supported by the objective medical evidence." (Tr. 21.) Specifically, the ALJ stated that the opinions were "not supported by the conservative treatment that [Robertson] has received for her impairment and her own stated activities of daily living." (Tr. 21.)

Robertson argues that the ALJ improperly rejected Dr. More-O'Ferrall's opinions, recycling the same insufficient reasons he offered for discounting Robertson's alleged symptoms. (ECF No. 13 at 18-21; ECF No. 18 at 4-5.) She maintains that it is unclear what objective medical evidence the ALJ found to be lacking, as treatment notes revealed severe disc degeneration and severe disc space collapse at L5-S1 and that upon physical examination Robertson exhibited tenderness, moderately reduced range of motion, bilateral positive sacroiliac compression tests, an antalgic gait, tender points consistent with fibromyalgia, and a positive straight leg raise test. Robertson also maintains that the ALJ impermissibly interpreted tests results and raw medical data.

The court agrees that the ALJ failed to build an accurate and logical bridge between the evidence and his decision to give little weight to Dr. More-O'Ferrall's opinions. Earlier in the decision, the ALJ summarized the objective medical evidence. (*See* Tr. 20.) However, the ALJ did not cite any particular medical findings when evaluating the medical opinion evidence or explain why Dr. More-O'Ferrall's opinions were not supported by those previously discussed findings. Likewise, the ALJ failed to explain how Robertson's reported activities were inconsistent with Dr. More-O'Ferrall's opinions. In fact, the ALJ only briefly mentioned Robertson's daily activities, noting that she had minimal difficulty with personal care but some difficulty with other activities (Tr. 19-20) and erroneously concluding that she claimed greater capabilities in her function report than she did at the hearing (Tr. 22). Moreover, as explained above, the

ALJ failed to discuss evidence relating to Robertson's conservative care and contradicting her purported improvement.

The Commissioner argues that, in addition to the objective medical evidence, treatment recommendations, and Robertson's own statements, the ALJ relied on the opinions of state agency medical consultants Mina Khorshidi, MD, and Pat Chan, MD. (ECF No. 17 at 7-10.) It's true that the ALJ gave great weight to the opinions of the state agency consultants and relied on those opinions in assessing Robertson's RFC. (*See* Tr. 19-22.) However, the ALJ did not cite inconsistency with the state doctors' opinions as a reason for discounting Dr. More-O'Ferrall's opinions. "[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ." *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)) (other citations omitted).

Accordingly, the ALJ erred in evaluating Dr. More-O'Ferrall's opinions. This error was material, as the VE testified that no employer would tolerate an employee with the off-task and absenteeism limitations opined by Dr. More-O'Ferrall. (*See* Tr. 52-53.)

## III. Fibromyalgia

The ALJ determined that Robertson's fibromyalgia was not an MDI "[b]ecause the evidence of record [did] not include a diagnosis and examination compliant with either the 1990 or the 2010 ACR criteria." (Tr. 18.) Specifically, "there [were] no treatment notes

during or in close proximity to the period at issue establishing a diagnosis of fibromyalgia." (Tr. 18.)

"When a person seeks disability benefits due in whole or in part to [fibromyalgia], [the Social Security Administration] must properly consider the person's symptoms when [it] decide[s] whether the person has an MDI of [fibromyalgia]." SSR 12-2p. "[B]efore [the SSA] find[s] that a person with an MDI of [fibromyalgia] is disabled, [the agency] must ensure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity." *Id.* "Generally, a person can establish that he or she has an MDI of [fibromyalgia] by providing evidence from an acceptable medical source." *Id.* A physician's diagnosis alone is insufficient. Rather, "[t]he evidence must document that the physician reviewed the person's medical history and conducted a physical exam." *Id.* The agency "review[s] the physician's treatment notes to see if they are consistent with the diagnosis of [fibromyalgia], determine whether the person's symptoms have improved, worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities." *Id.*

The SSA will find that a person has an MDI of fibromyalgia if the physician diagnosed fibromyalgia; the physician provides evidence satisfying the criteria of the 1990 American College of Rheumatology (ACR) Criteria for the Classification of

Fibromyalgia or the 2010 ACR Preliminary Diagnostic Criteria; and the physician's diagnosis is not inconsistent with other evidence in the person's case record. SSR 12-2p. Under the 1990 ACR Criteria, a person has an MDI of fibromyalgia if she has all three of the following: (1) a history of widespread pain in all quadrants of the body that has persisted for at least three months; (2) at least eleven positive tender points on physical examination; and (3) evidence that other disorders that could cause the symptoms or signs were excluded. *Id.* Under the 2010 ACR Criteria, a person has an MDI of fibromyalgia is she has all three of the following: (1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions (including fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome); and (3) evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded. *Id.*

Robertson argues that the ALJ erred in evaluating her fibromyalgia impairment. (ECF No. 13 at 8-11; ECF No. 18 at 1-3.) She maintains that Dr. More-O'Ferrall diagnosed fibromyalgia and that she exhibited signs and symptoms of fibromyalgia upon examination. Thus, according to Robertson, symptoms and limitations stemming from her fibromyalgia should have been accounted for in the ALJ's RFC assessment.

The court agrees that the ALJ erred in finding that Robertson's fibromyalgia was not an MDI. In a February 2016 treatment note, Dr. More-O'Ferrall remarked, "I feel

[Robertson] may have fibromyalgia. She certainly has multiple tender points positive, the chronic fatigue, and widespread pain; however, it appears she does not have too much difficulty with sleep." (Tr. 482.) He listed fibromyalgia as one of his diagnoses (Tr. 482, 488, 501), and other providers followed suit (*see* Tr. 485, 509, 531, 535, 543, 547, 550, 554, 568, 578). Treatment notes also repeatedly reference widespread pain and fatigue (*see* Tr. 482, 485, 488, 551, 554), and in August 2017 Robertson had thirteen out of eighteen tender points positive for fibromyalgia (Tr. 534). The ALJ mentioned this evidence later in his decision (*see* Tr. 20) but inexplicably concluded that there were no treatment notes establishing a diagnosis of fibromyalgia or an examination compliant with the 1990 or the 2010 ACR Criteria.

The Commissioner argues that the ALJ's finding was reasonable because Robertson "cannot show 'evidence that other disorders that could cause the symptoms or signs' she complained of had been considered and ruled out by her physicians." (ECF No. 17 at 5.) But because the ALJ based his determination on the lack of diagnosis and the failure to satisfy the first two elements of the 1990 and the 2010 ACR Criteria, he never reached that issue. Moreover, the record does contain imaging tests that potentially could be used to rule out other disorders. (*See* Tr. 322-23, 333-34, 469.) The court, however, is not qualified to analyze those findings to ascertain whether they satisfy the third elements of the 1990 and the 2010 ACR Criteria.

The Commissioner also argues that any error was harmless because Dr. Khorshidi and Dr. Chan considered Robertson's fibromyalgia diagnosis and opined that she still was capable of light work with postural limitations and because Robertson "cannot show her fibromyalgia caused symptoms or limitations the ALJ did not consider." (ECF No. 17 at 6-7.) The court disagrees. First, it is unclear to what extent the state doctors considered evidence relating to Robertson's fibromyalgia. The evidence was not mentioned in the initial agency determination. (*See* Tr. 56-64.) On reconsideration, Dr. Chan noted the fibromyalgia diagnosis but did not mention evidence of widespread pain, fatigue, or positive tender points. (*See* Tr. 67-77.) Second, Dr. More-O'Ferrall opined that Robertson had several work-preclusive limitations stemming, in part, from her fibromyalgia (*see* Tr. 501-04), and the court already has determined that the ALJ erred in evaluating that opinion. The court, therefore, cannot predict with "great confidence" that the result would be the same upon remand. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (discussing harmless error).

## IV.  New evidence

"A reviewing court may order additional evidence to be taken before the Commissioner upon a showing that there exists 'new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Schmidt v. Barnhart*, 395 F.3d 737, 741-42 (7th Cir. 2005) (quoting 42 U.S.C. § 405(g) (citing *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997)). "Evidence is 'new'

if it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Schmidt*, 395 F.3d at 742 (quoting *Perkins*, 107 F.3d at 1296). "New evidence is 'material' if there is a 'reasonable probability' that the ALJ would have reached a different conclusion had the evidence been considered." *Schmidt*, 395 F.3d at 742 (quoting *Johnson v. Apfel*, 191 F.3d 770, 776 (7th Cir. 1999)).

Robertson requests that this matter be remanded pursuant to sentence six of 42 U.S.C. § 405(g) for consideration of evidence that was not part of the administrative proceedings. (ECF No. 13 at 21-24; ECF No. 18 at 5-6.) The evidence consists of notes from physical therapy; recent treatment notes from her pain management clinic; and MRIs of her lumbar spine, cervical spine, and brain. (*See* ECF No. 13-1.) The physical therapy notes, the pain management notes, and the lumbar spine MRI all are dated prior to the Appeals Council's decision, and Robertson has not attempted to argue that these records are material or that good cause existed for not incorporating them earlier. Thus, this evidence (i.e., ECF No. 13-1 at 6-68) does not provide a basis for remand.

That leaves the cervical spine and the brain MRIs. Robertson underwent an MRI of her cervical spine on February 8, 2019. (*See* ECF No. 13-1 at 4-5.) The MRI revealed a large mass within the left parieto-occipital region; multi-level degenerative changes, most pronounced at C5-C6 and C6-C7; no significant canal narrowing; no cord lesions or frank tonsillar ectopia; and foraminal narrowing ranging from mild-to-moderate-to-severe, most pronounced at right C5-C6 and right C6-C7. Five days later, Robertson had her brain

scanned. (*See* ECF No. 13-1 at 1-3.) The MRI revealed a 6.6 x 4.8 x 6.1 cm mass on her brain—that is, likely a benign tumor.[2] Robertson argues that the MRIs provide possible etiologies for her cervical pain and headaches. (ECF No. 13 at 22-24.)

Whether Robertson has met her burden for a sentence-six remand is largely moot given that the court has already determined that reversal is warranted. Nevertheless, the MRIs occurred after the Appeals Council denied review. Robertson, therefore, has shown that the evidence is "new" and that "good cause" exists for her failure to incorporate such evidence in a prior proceeding. The evidence also is arguably "material." Robertson frequently complained about neck pain and headaches (*see, e.g.*, Tr. 333-34, 374, 392, 436, 449, 468, 508, 530-31, 537, 542, 545-46, 549-53, 556, 566, 574, 576) and was diagnosed with cervicalgia (Tr. 482, 485, 488, 491), and the VE testified that no jobs would be available to a person who could only occasionally rotate, flex, or extend her neck in all directions (Tr. 50-51). With the other errors corrected, it is reasonably probable that the ALJ would reach a different result if this new evidence had been considered.

## CONCLUSION

For all the foregoing reasons, the court finds that the ALJ erred in evaluating (1) Robertson's alleged symptoms; (2) Dr. More-O'Ferrall's opinions; and (3) Robertson's fibromyalgia impairment. Based on this record, however, the court cannot determine

---

[2] Robertson passed away on February 28, 2019, due to brain hemorrhage during a biopsy of the tumor. (*See* ECF No. 13 at 1.)

whether Robertson was disabled as of September 15, 2014. Accordingly, the court concludes that it is necessary to remand this matter to the Commissioner for reconsideration of the ALJ's step-two finding, RFC assessment, and, potentially, step-five finding. On remand, the ALJ shall also consider the recent cervical spine and brain MRIs.

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **reversed**, and this matter is **remanded** for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 10th day of February, 2020.

WILLIAM E. DUFFIN
U.S. Magistrate Judge